# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

MARIO L. SIMS & TIFFINY SIMS,    )
    )
       Plaintiffs,    )
    )
      v.    )    Cause No. 3:15-cv-263
    )
NEW PENN FINANCIAL LLC, dba    )
SHELLPOINT MORTGAGE SERVICING,    )
    )
       Defendant.    )

## OPINION & ORDER

In 2008, Mario Sims and his wife bought a home in South Bend, Indiana from John Tiffany pursuant to a land-sale contract. At the time, there was a mortgage on the property. After the sale, Tiffany stopped paying the mortgage, causing the bank to foreclose. The Simses approached Resurgent, the mortgage servicer and the predecessor of defendant New Penn Financial LLC, d/b/a Shellpoint Mortgage Servicing, about assuming the mortgage. They submitted financial paperwork to Shellpoint to start the process, but they didn't realize that they would have to bring the mortgage current in order to assume it. When Shellpoint later informed them of that fact, the Simses filed this lawsuit. The complaint is reminiscent of a blunderbuss. It alleges numerous theories under both state and federal law. Shellpoint seeks judgment on the pleadings on preclusion grounds and dismissal for failure to state a claim. For their part, the Simses move to strike parts of Shellpoint's motion as "scandalous." For the reasons below, Shellpoint's motion will be denied in part and granted in part, and the Simses'

motion to strike is denied.

## Background

Mario Sims and his wife bought a home in South Bend, Indiana from John Tiffany for $185,000 via a land-sale contract on October 31, 2008. (DE 2-1 at 2.) The contract stated that Tiffany would provide evidence of "a merchantable title to the Real Estate . . . , except as to the real estate mortgage held by 1st Source Bank." (*Id.* at 5.) Tiffany appears to be the bad guy in this story because, about a year later, the bank initiated foreclosure proceedings on the property against Tiffany and the Simses. Tiffany had stopped paying the mortgage. (DE 15 at ¶ 6.) By that time the Simses already had paid Tiffany more than $26,000 for the home. (*Id.*)

In June 2011, Tiffany filed a chapter 7 bankruptcy petition, which had the effect of temporarily staying the foreclosure proceedings and led the Simses to sue him for fraud. *In re Tiffany*, No. 11-32492 (Bankr. N.D. Ind. June 22, 2011) (DE 1); *Sims v. Tiffany (In re Tiffany)*, No. 11-03045 (Bankr. N.D. Ind. July 20, 2011) (DE 1). The Simses ultimately settled their case against Tiffany, and Tiffany executed a quitclaim deed in the Simses' favor on March 13, 2012. (DE 2-1 at 11; DE 15 at ¶ 7.) But that didn't do them much good because the mortgage on the home was still outstanding and neither the lender nor the mortgage servicer was a party to the deed. (*Id.*)

In October 2012, the bankruptcy court lifted the stay, allowing the foreclosure proceedings to resume. *In re Tiffany*, No. 11-32492 (Bankr. N.D. Ind. Oct. 31, 2012) (DE 82). On May 31, 2013, the state court hearing the foreclosure case granted summary

judgment, ruling that "[t]he mortgage . . . is hereby foreclosed as a valid and paramount lien and the equity of redemption of . . . Tiffany Sims [and] Mario Sims is hereby foreclosed with respect to the described real property[.]" (DE 19-1 at 49–50.) The court further provided for the property to be sold by the sheriff with proceeds going to satisfy the sum due to the bank and that, at the bank's request "the Sheriff shall evict any Defendants, and any person . . . found occupying the premises[.]" (*Id.* at 50.)

On December 10, 2014, Shellpoint sent a letter to the Simses that is a focal point of this dispute. (DE 15 at ¶ 9; DE 2-1 at 30–31.) That letter stated that the unpaid principal on the loan was $126,257.96, acknowledged "that Shellpoint has made contact with the mortgagor and will begin the process of a mortgage assumption,"and provided a list of documents Shellpoint needed to begin its review. (DE 2-1 at 30.) The Simses say they submitted the paperwork within five days by fax and email. (DE 15 at ¶10.)

In the meantime, a sheriff's sale of the property was scheduled for January 8, 2015. (DE 15 at ¶ 11; DE 2-1 at 33.) The Simses' attorney wrote Shellpoint and asked them to postpone the auction for 30 days, to allow for completion of the assumption process. (DE 2-1 at 35.) Their attorney also filed a complaint with the Consumer Financial Protection Bureau, with the same request that Shellpoint postpone the sale "pending resolution of the assumption process." (DE 15 at ¶11.) Shellpoint responded on January 30th, agreeing to postpone the foreclosure sale "in an effort to allow you to submit the documentation that we previously requested . . . [on] December 10, 2014."

(DE 2-1 at 37.) Shellpoint's letter also included the following caution:

> Please be advised that Shellpoint is not responsible for any written or verbal agreement and or monetary exchanges between yourself and the mortgagor, John Tiffany, as we solely service the referenced loan in accordance with the original loan agreement and all applicable state laws and federal regulations *until such time as the loan has been paid in full, settled for less than the total amount, or foreclosed and liquidated.*

(*Id.* (emphasis added).) The Simses say they then resubmitted the paperwork they'd sent in December 2014. (DE 15 at ¶ 14.)

On March 6, 2015, Shellpoint responded to the Simses' consumer complaint, stating that Shellpoint could not disclose certain information about the mortgage including "the total amount required to reinstate the mortgage obligation" until it received authorization from Tiffany and that the Simses would "be required to reinstate the loan by paying the total amount due prior to assuming the rights and obligations under the promissory note and security instrument." (DE 2-1 at 41.) The March 6th letter also asked the Simses to provide updated financial paperwork and the executed quitclaim deed for the property. (*Id.*) Finally, the letter warned the Simses that Shellpoint could reschedule and complete a foreclosure sale consistent with the terms of the original agreement and applicable law, if it did not receive the requested documentation within 30 days. (*Id.* at 42.)

The Simses then filed a second complaint with the Indiana Consumer Financial Protection Bureau, which requested a postponement of the sale, asked that "some portion of the funds we paid Mr. Tiffany to be credited to the loan's remaining

balance[,]" and alleged violations of Dodd-Frank Wall Street Reform and Consumer Protection Act. (DE 15 at ¶ 20; DE 2-1 at 51.) After they filed this second consumer complaint, the Simses allege Shellpoint really started giving them the run around — for example, by refusing to discuss the mortgage with the Simses without further information, hanging up on them, and failing to return calls, emails, and letters. (DE 15 at ¶ 21.)

Shellpoint formally responded to the Simses' second consumer complaint on June 24, 2015, stating that "[i]n order for Shellpoint to allow you to assume the mortgage, you will be required to reinstate the loan" and providing the following explanation:

> Please know that Shellpoint did not authorize the land contract agreement entered between you and Mr. Tiffany, therefore we are unable to honor your request to credit an amount of $56,000.00 that you stated were paid to Mr. Tiffany to the mortgage associated with the subject property.

(DE 2-1 at 51.) The June 24th letter also stated that the sheriff's sale was set for July 23rd and that it would not be canceled. (*Id.*) All of which caused the Simses to file this cause of action *pro se* on June 25, 2015. (DE 1.) The Simses also sought a temporary restraining order from this court in an effort to stall the sheriff's sale. (DE 2; DE 9.) At the hearing on the motion for a TRO, I was advised that the sheriff's sale had been cancelled, so I denied the request for a TRO as moot. (DE 13.) I told the Simses at the hearing that if the sheriff's sale got reset, they could refile their request for a TRO. (*Id.*) It is unclear to the court what the present status of the sheriff's sale is.

**Discussion**

Shellpoint has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or to dismiss under Rule 12(b)(6). The same standards apply under Rule 12(c) and under Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). To survive either, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation marks and citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs, but I am not required to accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 663. But I am mindful that because the Simses are *pro se*, I must construe their complaint liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

One other thing as it relates to the governing standard: this case includes claims based upon fraud. These claims are subject to the heightened pleading standard of Rule 9(b) and must be plead with particularity, which means that the complaint must provide "the who, what, when, where, and how" for each claim. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); Fed. R. Civ. P. 9(b).

1.     **Motion for Judgment on the Pleadings on Preclusion Grounds**

The Simses allege more than a dozen state and federal claims against Shellpoint, all stemming from the Simses' unsuccessful attempt to assume Tiffany's mortgage. (DE

6

15 at ¶¶30–86.) Shellpoint argues that all these claims are barred by *res judicata* because they were or could have been litigated in the foreclosure proceedings conducted and affirmed by Indiana courts. (DE 19 at 7–13.) The doctrine of *res judicata* "serves to prevent repetitious litigation of disputes which are essentially the same." *Kalwitz v. Kalwitz*, 934 N.E.2d 741, 750 (Ind. Ct. App. 2010). One manifestation of *res judicata* is claim preclusion, which bars subsequent claims if: (a) the former judgment was rendered by a court of competent jurisdiction; (b) the former judgment was on the merits; (c) the prior action was between the same parties or their privies; and (d) the current claims were or could have been determined in the prior action. *Id.* at 750; *see also Dawson v. Estate of Ott*, 796 N.E.2d 1190, 1195 (Ind. Ct. App. 2003).

There is no dispute that first and second requirements are met here. The St. Joseph Superior Court had jurisdiction over the foreclosure proceedings, and those proceedings were decided on the merits. (*See* DE 19-1 at 47–50 (May 31, 2013 Entry of In Rem Judgment and Decree of Foreclosure), *aff'd*, 2014 WL 817998 (Ind. Ct. App. Feb. 28, 2014), *trans. denied*, 16 N.E.3d 980 (Ind. 2014).) The third requirement is also satisfied. The Simses are plaintiffs here and were counter-plaintiffs in the foreclosure proceedings. (DE 19-1 at 47.) Defendant Shellpoint was not a party to the foreclosure proceedings, but is a privy of the Bank of New York Mellon, plaintiff and counter-defendant in the foreclosure proceedings. (*See id.*) "A privy . . . is one whose interests are represented by a party to the action. . . . In determining the parties for res judicata purposes, the court looks beyond the nominal parties and treats those whose interests

7

are involved as the real parties." *Becker v. State*, 992 N.E.2d 697, 700–701 (Ind. 2013) (internal quotation marks, citation, and brackets omitted); *see also Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682 (7th Cir. 1986) ("Strict identity of the parties is not necessary to achieve privity. Privity applies to successive parties who adequately represent the same legal interests."). Shellpoint is a loan servicer whose only interest in the mortgage is derivative of the bank's interest, which was represented by the bank during the foreclosure.

Which leaves us with the question of whether the claims now at issue were or could have been determined in the foreclosure proceedings, as Shellpoint argues. While it is true that some of the events underlying the Simses' claims occurred before the foreclosure was granted in May 2013, all of the current claims also rely at least in part on events that allegedly occurred *after* 2013. For example, the Simses could not bring any fraud or fraud-based claims until they became aware that reinstatement of the mortgage was required before assuming the loan or applying to assume it, and they claim to have learned that fact in 2015. Similarly, the Simses' contract-based claims could not have been raised in the foreclosure proceedings because Shellpoint's alleged breach did not occur until 2015, when Shellpoint did not allow the Simses to assume the mortgage and instead put the property up for sale. The claims in this cause of action, therefore, are not barred by *res judicata*, and Shellpoint's motion for judgment on the pleadings is denied.

### 2.     Motion to Dismiss for Failure to State a Claim

As I noted above, the complaint in this case has many claims. Shellpoint attacks all of them on the grounds that they fail to state a claim. I will address each count in turn.

#### *Count One: Fraud or Misrepresentation*

Count One alleges that Shellpoint committed fraud in December 2014, when it sent a letter to the Simses about assuming Tiffany's mortgage that did not disclose that they would have to reinstate the mortgage in order to assume it. (DE 15 at ¶ 31.) The Simses further allege that Shellpoint "made the above representation knowing it to be false, with the intention of deceiving and inducing the Simses to pay a debt that was not theirs, John Tiffany's delinquent mortgage payments." (*Id.* at ¶ 32.) The question is whether the Simses have pleaded their fraud claim with particularity as required by Rule 9(b) and whether the complaint otherwise states a fraud claim.

Actual fraud under Indiana law requires "a material representation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, [and] which causes reliance to the detriment of the person relying upon it." *First Nat'l Bank of New Castle v. Acra*, 462 N.E.2d 1345, 1348 (Ind. Ct. App. May 10, 1984); *Vaughn v. Gen. Foods Corp.*, 797 F.2d 1403, 1410 (7th Cir. 1986). Although an omission may form the basis of an actual fraud claim, there must be a duty to disclose the facts omitted, and it is the obligation of the plaintiff to establish that duty. *Barnd v. Borst*, 431 N.E.2d 161, 168 (Ind. Ct. App. Feb. 15, 1982) ("[W]here there is no duty to speak or

disclose facts, silence will not constitute actionable fraud.").

Here, the Simses haven't adequately pleaded actual fraud based on an omission, among other reasons, because they don't—and seemingly can't—allege that Shellpoint had a duty to tell them *anything*. Their opposition brief claims there was an agreement by the bank in 2010 to provide assumption paperwork to the Simses (DE 22 at ¶¶ 18–19), but "[c]ontractual agreements do not give rise to a fiduciary relationship creating a duty." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. Feb. 13, 2015) (citation and internal quotation marks omitted). Nor can the Simses' fraud claim be based on Shellpoint's "promise[] that it would provide and process the assumption request." (DE 22 at ¶ 35). That's a representation about future conduct which cannot form the basis for a fraud claim. *Anderson v. Indianapolis Ind. AAMCO Dealers Advert. Pool*, 678 N.E.2d 832, 837 (Ind. Ct. App. Apr. 14, 1997). The complaint also fails to allege any facts supporting the Simses' claim that they relied on Shellpoint's omission or misrepresentation to their detriment. (*See* DE 15 at ¶ 35 (referring to "compensatory general and special damages" with no elaboration).) For example, the complaint does not say whether the Simses ever made any payments directly to Shellpoint or its predecessor after they learned that Tiffany had defaulted, after Bank of New York Mellon foreclosed on the property, or after Shellpoint's December 2014 letter.

Any constructive fraud claim that the Simses meant to allege is similarly flawed. For there to be a constructive fraud, there has to be, among other things, a duty owed by the defendant to the complaining party due to their relationship and "the gaining of

an advantage by the party to be charged at the expense of the complaining party." *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). As discussed above, the complaint fails to identify any duty by Shellpoint to speak. Additionally, the complaint does not allege any facts supporting the claim that Shellpoint received an advantage at the Simses' expense. The Simses' opposition brief includes nearly three full pages of news articles about abuses of the U.S. government's loan modification programs and about how mortgage servicers get paid, but I fail to see any relevance to this case. The Simses were not parties to the mortgage that Shellpoint was servicing, and therefore Shellpoint could not take advantage of a loan modification program. The complaint needed to allege that the mortgage servicer *in this case*—Shellpoint—received an advantage and that the advantage came at the Simses' expense. It has failed to do that. The Simses have failed to allege a colorable claim of actual or constructive fraud, and so Count One must be dismissed.

### Counts Two, Three, Ten and Eleven: Contract-Based Claims

The Simses' complaint also alleges breach of contract and several other claims that depend on the existence of a contract between the Simses and Shellpoint. (DE 15 at 11–12, 16–17.) Construing the complaint liberally, the Simses allege either that Shellpoint's December 2014 letter was itself an enforceable contract, pursuant to which Shellpoint agreed to permit the Simses to apply to assume (or to actually assume) Tiffany's mortgage without paying past due amounts, or that the December 2014 letter was evidence of an earlier oral agreement to such terms between Shellpoint and the

Simses. (DE 15 at ¶¶ 37–41, 66.) The scattershot complaint further alleges that (a) Shellpoint breached its contract with the Simses in retaliation for their having filed a consumer protection complaint (*id.* at ¶ 37 (Count Two)), (b) breached the implied covenants of good faith and fair dealing by some unspecified "actions" (*id.* at ¶ 40 (Count Three)), (c) committed tortious interference with the purported contract (*id.* at ¶ 65–66 (Count Ten)), and (d) violated the Simses' civil right to make and enforce contracts by responding to the Simses' consumer protection complaint (*id.* at ¶ 68 (Count Eleven)).

None of these claims can survive because no contract between Shellpoint and the Simses is plausibly alleged in the complaint. One cannot breach a contract that doesn't exist. An enforceable contract under Indiana law requires "offer, acceptance of the offer, consideration, and [a] meeting of the minds between the parties. *Bennett v. Broderick*, 858 N.E.2d 1044, 1048 (Ind. Ct. App. Dec. 27, 2006) (also stating that "the parties must have a meeting of the minds on all essential terms in order for a contract to be binding"). The material terms of a contract must be reasonably certain or determinable and must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. Ct. App. Mar. 20, 2002) (quoting Restatement (Second) of Contracts § 33(2) at 92 (1979).

But the complaint does not allege *any* agreement between the Simses and Shellpoint, and even if it does, the material terms of any such agreement are impossible to determine based on the pleadings. It's even a stretch to claim the letter was an *offer* to

allow the Simses to apply to assume the mortgage without satisfying any prerequisites other than those listed because the letter explicitly states that Shellpoint would "begin our review" upon receiving financial documents from the Simses. (*See* DE 2-1 at 30–31.) The point of collecting and reviewing such documents was clearly to determine whether the Simses met Shellpoint's requirements for borrowers. It's a matter of common sense that if the Simses had bad credit history or didn't make enough money, Shellpoint had every right to deny their application. It should have been clear to the Simses that Shellpoint did not intend to be bound by the December 2014 letter.

In their response brief, the Simses claim that the purported contract required Shellpoint to provide assumption paperwork and "the subsequent execution of a document, the assumption paperwork."(DE 22 at ¶¶ 45–46.) But that is even further from the mark. As Shellpoint points out, "a mere agreement to agree at some future time is not enforceable." *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996) (citing *Wallace v. Mertz*, 156 N.E. 562 (Ind. 1927).

While the Sims claim "[t]here is no uncertainty as to any substantial term of the settlement contract," in actuality not a single substantial term of the contract is definite or clear. For example, if the agreement was to allow the Simses to assume the mortgage, then what was the term of the mortgage to be? What about the interest rate? Monthly payments? And, if the agreement was to provide the Simses with assumption paperwork and/or allow them to apply, what were the terms of that agreement? What paperwork was Shellpoint obligated to provide? By what date? When were the Simses

required to respond? What would happen if a party breached? None of the these terms is alleged or even hinted at in the complaint or in Shellpoint's December 2014 letter. Even giving the complaint the broad reading I'm required to, it simply does not adequately plead the existence of an enforceable agreement, and without one there could be no breach. Count Two must be dismissed.

The Simses' other contract-based claims also cannot withstand the motion to dismiss. In Indiana, the covenant of good faith and fair dealing is implied only in "limited circumstances such as those involving insurance contracts and those involving a fiduciary relationship." *First Fed. Sav. Bank. v. Key Markets, Inc.*, 559 N.E. 2d 600, 605 (Ind. 1990); *Old Nat. Bank. v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. Apr. 23, 2015). Even if Shellpoint were party to a contract with the Simses, it wouldn't have been an insurance contract or an employment contract with an implied covenant of good faith and fair dealing. And as discussed above, the Simses have not alleged that Shellpoint had a fiduciary relationship with them. As a result, Shellpoint was not bound by and could not breach the covenant of good faith and fair dealing. Count Three must be dismissed.

The Simses' claim for tortious interference with a contract is also a nonstarter. If there had been a contract between the Simses and Shellpoint, Shellpoint's violation of that contract would be a *breach*, not tortious interference. *See Martin v. Platt*, 386 N.E.2d 1026, 1027 (Ind. Ct. App. Mar. 26, 1979) (stating tortious interference with a contract requires "the intervention of a third party [and] will not lie against a party to the

14

contract") To plausibly allege tortious interference against Shellpoint, the Simses must allege that Shellpoint interfered with a contract between the Simses *and someone else.* In other words, a contract to which Shellpoint was not a party. Count Ten of the complaint must be dismissed.

Finally, the failure of the complaint to allege a binding contract also means that the Simses' claim under 42 U.S.C. § 1981 must be dismissed. See *Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003) ("There is no dispute . . . that proof of a contractual relationship is necessary to establish a section 1981 claim.") (citation omitted). Even if there were a contract, I still would have to dismiss this claim because the complaint does not plausibly allege that Shellpoint intended to discriminate and does not provide any facts from which I can infer such an intent. *See Morris v. Office Max, Inc.* 89 F.3d 411, 414 (7th Cir. 1996) (stating that section 1981 plaintiffs must plead that: "(1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)") (citations omitted); *see also* DE 15 at ¶ 68; DE 22 at 121 (concluding that Shellpoint must have intentionally discriminated against the Simses because "there is no [other] rational reason that explains Defendant's conduct"). Indeed, it's unclear from the complaint whether Shellpoint even knew of the Simses' race. This is insufficient even for Rule 8 and even for plaintiffs proceeding *pro se.* Count Eleven must be dismissed.

### Count Four: Negligence Claims

Count Four of the complaint alleges negligence based on Shellpoint's purported breach of a "duty to exercise reasonable care and skill to maintain proper control" under the Truth in Lending Act. (DE 15 at 12.) Shellpoint alleges this claim must be dismissed for several reasons, first among them that the Simses may not simultaneously allege breach of contract and negligence. (*See* DE 19 at 20–21). That's untrue. It's entirely proper to plead alternative claims. *See* Fed. R. Civ. P. 8(d)(3).

In any event, I have already determined that the complaint does not plausibly allege a contract claim, and so I need to consider their alternative claim based in tort. Shellpoint argues that the negligence claim should be dismissed because the complaint does not allege that Shellpoint owed Simses a duty, one element of a negligence claim. (DE 19 at 28.) I agree. To prevail on a negligence claim under Indiana law, the Simses must show that (a) Shellpoint owed a duty to exercise reasonable care; (c) Shellpoint breached that duty; and (c) the Simses sustained injuries that were the proximate cause of Shellpoint's breach. *See Fast Eddie's*, 688 N.E.2d 1270, 1272 (Ind. Ct. App. July 28, 1997). The Simses have failed to allege that Shellpoint owed any common law or statutory duty to them. *See id.* ("[A]bsent a duty, there can be no negligence."). Count IV references the Truth in Lending Act ("TILA") and argues Shellpoint violated a "duty to exercise reasonable care and skill to maintain proper control[,]" but it says little else. (DE 15 at 12–13.) It does not say what disclosure requirements TILA imposed on Shellpoint, whether those requirements applied to Shellpoint's December 2014 letter, or how Shellpoint's interactions with the Simses violated TILA's requirements. Count

Four's bare bones allegations are simply insufficient to give Shellpoint notice of the nature of the Simses' claims against them—under TILA or otherwise.

Finally, Shellpoint also correctly argues that any negligence claim by the Simses would be barred by the economic loss doctrine. (DE 19 at 20–21). "Under Indiana's economic loss doctrine, and subject . . . there is no liability in tort for pure economic loss caused unintentionally[,]" with few exceptions. *See JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 785 (7th Cir. 2015) (citing *Indianapolis-Marion Cnty. Pub. Lib. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 736 (Ind. 2010). The Simses don't challenge the assertion that they only seek economic damages but instead argue in their opposition brief that Count Four is actually a claim for negligent misrepresentation, an exception to the general economic loss rule. (*See* DE 22 at 33; *see also Indianapolis-Marion Cnty. Pub. Lib.*, 929 N.E.2d at 741.) The problem is that Indiana recognizes the tort of negligent representation only in specific circumstances not present here. *See Thomas v. Lewis Eng'g, Inc.*, 848 N.E.2d 758, 760 (Ind. Ct. App. June 7, 2006) ("[I]t is clear that to date Indiana has not recognized that a duty exists to support the tort [of negligent misrepresentation] outside the limited context of an employment relationship."); *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 721 (7th Cir. 1994); *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742 (Ind. 2010) (allowing a negligent misrepresentation claim to proceed "in the context of the title insurance industry"). As a result, any negligence claim the Simses might be able to cobble together would be barred by the fact that they have not been physically injured.

For these reasons, the Simses have not plausibly alleged a claim of negligence, and Count Four must be dismissed.

### Counts Five and Six: the Indiana Deceptive Consumer Sales Act (IDCSA)

Counts Five and Six of the complaint allege that Shellpoint violated the IDCSA "by demanding payment for a debt that was not the Plaintiffs'" and that Shellpoint acted "with knowledge and intent to deceive." (DE 15 at ¶¶ 47, 50.) A stated purpose of the IDCSA is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts," and the statute enables consumers who rely on a "deceptive act" of a supplier to sue for damages. Ind. Code §§ 24-5-0.5-1(b)(2). I read Counts Five and Six to allege a "deceptive act" under IDCSA or one done "with intent to defraud or mislead" because the complaint alleges that Shellpoint acted "with knowledge and intent to deceive."

The problem is that the complaint fails to allege *any* act that could be construed as a deceptive act under the statute. *See* Ind. Code. §§ 24-5-0.5-3(b), -10 (listing conduct that constitutes a "deceptive act"). Shellpoint's attempt to get the Simses to pay Tiffany's debt doesn't fit the bill. Neither does Shellpoint's failure to disclose earlier in the process that the mortgage must be reinstated before being assumed or Shellpoint's "implied promise" to provide assumption paperwork. (DE 22 at ¶ 61; *see also* Lawson *v. Hale*, 902 N.E.2d 267, 273-74 (Ind. Ct. App. Feb. 26, 2009) (stating that misrepresentations can be deceptive acts, but the statute "requires an oral or written act or representation, and does not apply to non-disclosures") (citing *Berghausen v. Microsoft*

*Corp.*, 765 N.E.2d 592, 598 (Ind. Ct. App. Mar. 13, 2002).

As a result, the complaint does not plausibly allege an IDCSA claim under the more liberal standards of Rule 8, let alone the standard that governs fraud-based IDCSA claims—that is, the Rule 9(b) standard—like this one. *See McKinney v. State*, 693 N.E.2d 65, 71–72 (Ind. 1998). Counts Five and Six must be dismissed.

### Count Seven: Negligent or Intentional Infliction of Emotional Distress

Count Seven may be the finest example in this complaint of what the U.S. Supreme Court meant when it referred to "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" in *Ashcroft v. Iqbal*, 556 U.S. at 663. The elements of intentional infliction of emotional distress—here, that Shellpoint (1) engaged in extreme and outrageous conduct; (2) intentionally or reckless; (3) which caused; (4) severe emotional distress to the Simses, *see Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. Jan. 25, 2011)—are set down in all their unadorned glory on the page but are unaccompanied by a single fact supporting such a claim. (*See* DE 15 at ¶¶ 52–54 ). Instead, the complaint nakedly asserts that Shellpoint's violations of federal lending laws caused the Simses to suffer damages. (DE 15 at ¶ 55.) Even if Shellpoint did everything it is accused of in this complaint, that would not amount to conduct "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. Dec. 14, 1999) (summarizing the type of conduct that can support a claim for intentional infliction of

emotional distress). Accordingly, Count Seven must be dismissed.

### *Count Eight: Violation of the Fair Debt Collection Practices Act*

Count Eight of the complaint alleges that Shellpoint is a debt collector who violated the FDCPA by "demand[ing] payment from the Simses of a debt that is not theirs[.]" (DE 15 at ¶ 57.) The FDCPA is a federal statute that "prohibits a debt collector from using certain enumerated collection methods in its effort to collect a 'debt' from a consumer." *Jenkins v. Heintz*, 124 F.3d 824, 828 (7th Cir. 1997) (internal citation and quotation marks omitted). Shellpoint argues that the Simses' FDCPA claim is insufficiently pleaded and must be dismissed because it does not say what Shellpoint did that was prohibited under the FDCPA. (DE 19 at 25.) I agree. The complaint vaguely refers to "an act or omission prohibited by the FDCPA" but does provide further information. Perhaps the act or omission the Simses meant to allege was Shellpoint's failure to tell them that Tiffany's mortgage had to be current to be assumed. But even if so, that is not the type of "false or misleading representation" prohibited by the statute. 15 U.S.C. § 1692(e). Even more fundamentally, it's not at all clear from the complaint that the FDCPA protects the Simses at all. The statute defines a "consumer" as "any natural person obligated or allegedly obligated to pay a debt[,]" but the Simses, by their own admission, were never obligated to pay Tiffany's debt. *See* 15 U.S.C. § 1692(a)(6); DE 15 at ¶¶ 32, 48, 55, 57, 58, 62, 68. Accordingly, the complaint fails to allege a plausible FDCPA claim, and Count Eight must be dismissed.

### *Count Nine: Infringement of the Right to Privacy*

Count Nine of the complaint alleges that Shellpoint violated the Simses' right to privacy "[b]y soliciting Plaintiffs['] financial records under the pretext of reviewing a loan assumption . . . [that] was unavailable from the beginning[.] (DE 15 at ¶¶ 61–62 (alleging that, if Shellpoint had not "false[ly] represent[ed] that a[n] assumption was possible[,] the Simses would not have "released to the public" their tax returns, bank records and other financial records").) Shellpoint argues that this claim must be dismissed because it is vague and, to the extent it was intended to allege a Fourth Amendment claim, fails to allege a state actor. (DE 19 at 33.) These are concerns I voiced last summer, when I denied the Simses' request for a temporary restraining order to prevent the sheriff's sale of the property. (*See* DE 6 at 5.) Though the Simses have since amended the complaint, the language of this section remains virtually the same, and so this second amended complaint suffers from the very same problems I identified before. (*Compare* DE 2 at ¶¶ 60–63, *with* DE 15 at 60–63.) It might be that the Simses intend to allege a common law claim for invasion of privacy against Shellpoint, *see Cont'l Optical Co. v. Reed*, 86 N.E.2d 306, 308 (1949), but the complaint just doesn't say. Count Nine is insufficiently pleaded to give Shellpoint notice of the claim against them. It must be dismissed.

### Count Twelve: the Racketeering Claims

Count Twelve purports to allege claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*, and under Indiana's counterpart, the Civil Remedies for Racketeering Act ("CRRA"), Ind. Code. § 34-24-2-1

*et seq.* (DE 15 at ¶¶ 69– 86.) Shellpoint argues this count must be dismissed because the complaint does not allege two identifiable predicate acts of racketeering activity within ten years and because the complaint does not "describe the illegal nature of the activities and who the parties were[.]"(*See* DE 19 at 35; *see also* DE 25 at ¶9.) I agree that this count is inadequately pleaded and must be dismissed.

For starters, although the header for Count Twelve refers to the "Indiana CRRA," the complaint doesn't actually allege a CRRA violation and never even mentions the statute a second time. (DE 15 at ¶¶ 69– 86.) This is plainly insufficient to put Shellpoint notice of any CRRA claim against them.

As for the federal RICO claim, the Simses' best effort is their claim under section 1962(c)—and it leaves much to be desired. The elements of a RICO claim under 18 U.S.C. § 1962(c) are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (quotations omitted). Allegations that "simply . . . allege the . . . elements in boilerplate fashion" are not enough. *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727 (7th Cir.1998). Instead, plaintiffs must allege sufficient facts to support each element of a § 1962(c) claim. *Id.* When a RICO claim is based upon fraud, it must be pleaded with specificity. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999) (stating that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to civil RICO claims based on mail or wire fraud); *Slaney v. Intern. Amateur Athletic Fed.*, 244 F.3d 580, 597 (7th Cir. 2001) ("[A] RICO plaintiff must, at a minimum,

describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which [they] were communicated, and the identities of the parties to those misrepresentations.") (citations omitted).

Here, the complaint fails to allege most of the elements of a fraud-based RICO claim at all, let alone with the specificity required under Rule 9(b). The complaint neither identifies the person(s) allegedly "conducting" a RICO enterprise nor alleges an enterprise. Shellpoint is the only named defendant, which may suggest that the Simses meant to allege that Shellpoint was the person conducting the enterprise, but then what or who makes up the enterprise itself? A RICO enterprise must be separate and distinct from persons who conduct it through racketeering activity. *Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO.") (citations omitted); *United Food & Comm. Workers Unions & Emp'rs Midwest Health Benefits Fund. v. Walgreens Co.*, 719 F.3d 849, 854 (7th Cir. 2013) ("Section 1962(c) requires a plaintiff to identify a 'person'—i.e., the defendant—that is distinct from the RICO enterprise."). For this reason, if Shellpoint is the "person" doing the conducting, then it cannot also be the enterprise, whether alone or together with its employees and agents. *See id.; see also Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (holding that "an employer and its employees cannot constitute a RICO enterprise" and agreeing that RICO should be read to exclude claims where the "person" would be a corporation and the "enterprise" would be the

same corporation and its employees) (internal quotation marks and citation omitted).

The complaint also fails to plead a "pattern of racketeering activity." RICO defines "pattern" as at least two predicate acts within a ten-year period, and it lists the predicate acts that count. *See* 18 U.S.C. §1962 (1), (5). At best, the Simses complaint alleges two acts of mail or wire fraud by Shellpoint. To begin with, these allegations are insufficiently pleaded under Rule 9(b) because they don't disclose "the identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Slaney*, 244 F.3d at 599. But even if there were more meat on the bone, two acts of mail and/or wire fraud cannot constitute a pattern of racketeering activity, unless there is more than "one injury to one victim." *Id.; see also Tellis v. U.S. Fidelity & Guar Co.*, 826 F.2d 477, 478 (7th Cir. 1986) (holding that multiple acts of mail fraud related to one episode of fraud against one victim and relating to one basic transaction cannot constitute a pattern). The complaint alleges that "the primary objective of the racketeering enterprise has been to inflict severe and sustained economic hardship upon Plaintiffs with the intent of . . . preventing and discouraging Plaintiffs from completing assumption[.]" (DE 15 at ¶ 72.) The complaint does not allege that there were other victims, and there are no facts about the way Shellpoint conducted its business that would allow me to draw a reasonable inference that such victims exist. The complaint does not allege a plausible claim against Shellpoint under section 1962(c).

Any claims the Simses intended to plead under 18 U.S.C. §§ 1962(b) and (d),

which are referenced several times in the complaint, fare even worse. Section 1962(b) makes it unlawful "through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise." But the complaint simply fails to allege or even suggest facts that would support a claim under this section. There is nothing that suggests Shellpoint was attempting to collect an "unlawful debt," and, as discussed above, there is no "pattern of racketeering activity." The complaint does not allege that Shellpoint or its employee(s) acted to gain an interest or control of an enterprise. In short, the references to section 1962(b) sprinkled throughout Count Twelve are insufficient to give Shellpoint notice of any claim against them.

The same is true of section 1962(d), which makes it "unlawful for any person to conspire to violate" any of the other provisions of section 1962. To make out a section 1962(d) claim , a complaint must allege that two parties "agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity [and] that someone would commit at least two predicate acts to accomplish those goals." *Lachmund*, 191 F.3d at 784 (quoting *Goren*, 156 F.3d at 732). Shellpoint is the only defendant here, and though the complaint mentions some Shellpoint employees by name, no facts are alleged in the complaint that support an inference that two or more employees entered the requisite agreements under section 1962(d). The complaint does not plead a plausible claim under section 1962(d).

In sum, even a *pro se* litigant is required to allege something in the way of facts.

25

The complaint in this case, as it is presently drafted, does not allow me to infer that a plausible claim exists under CRRA or RICO. Count Twelve of the complaint must be dismissed.

### *Plaintiffs' Motion to Strike Scandalous Language*

The final matter I have to attend to is plaintiffs' motion to strike "scandalous paragraphs" in the motion to dismiss. (DE 23 (citing Fed. R. Civ. Proc. 12(f).) Because Rule 12(f) only permits me to strike scandalous language from a "pleading," and not from motions like Shellpoint's motion to dismiss, the Simses' motion to strike must be denied. See Fed. R. Civ. Proc. 7 (defining "pleading" and "motion" separately).

### Conclusion

As outlined above, Shellpoint's motion for judgment on the pleadings and motion to dismiss (DE 19) is **DENIED** in part and **GRANTED** in part**.** The portion of the motion requesting judgment on the pleadings is **DENIED**. But the portion of the motion seeking dismissal for failure to state a claim is **GRANTED**. The complaint is therefore dismissed, albeit without prejudice. The Simses are granted leave to file an amended complaint that addresses the many deficiencies identified above by no later than March 9, 2016 and are warned that failure to do so may result in dismissal of this case with prejudice. The Simses' Motion to Strike (DE 23) is **DENIED.**

**SO ORDERED.**

**ENTERED:** February 12, 2016.

s/ Philip P. Simon
CHIEF JUDGE

UNITED STATES DISTRICT COURT