UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MARIO L. SIMS and TIFFINY SIMS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Cause No. 3:15-cv-263 |
| | ) |
| NEW PENN FINANCIAL LLC, dba | ) |
| SHELLPOINT MORTGAGE SERVICING, | ) |
| | ) |
| Defendant. | ) |

## **OPINION & ORDER**

Mario and Tiffiny Sims bought a home in South Bend, Indiana from John Tiffany pursuant to a land-sale contract. A year later, they discovered that Tiffany had stopped paying the mortgage and that the home was in foreclosure. The bank foreclosed on the home in 2012, and it was set for a sheriff's sale in 2015, which led the Simses to file this case against the mortgage servicer. At bottom, they allege that Shellpoint would not allow them to assume Tiffany's mortgage without first bringing it current because they are African-American. I dismissed their previous complaint, which alleged 12 counts under federal and state law, but gave them an opportunity to amend it. They have now filed a Verified Third Amended Complaint, which retools several of the prior claims and articulates three new ones. Shellpoint has moved to dismiss for failure to state a claim. For the reasons below, the motion is granted in part and denied in part.

### **Background**

The facts are essentially the same as alleged in the Verified Second Amended

Complaint. Mario Sims and his wife bought a home in South Bend, Indiana from John Tiffany for $185,000 via a land-sale contract in October 2008. (DE 29-1 at 3–9.) The contract stated that Tiffany would provide evidence of "a merchantable title to the Real Estate . . . , except as to . . . the real estate mortgage held by 1st Source Bank." (*Id.* at 5.) All seemed well for about a year, when the Simses discovered a second mortgage on the property that Tiffany had stopped paying and learned that the mortgagee, Bank of New York, had initiated foreclosure proceedings. (DE 29 ¶¶ 5, 7.) By that time the Simses had paid Tiffany more than $26,000 for the home. (*Id.* ¶ 5.)

On January 28, 2010, the Simses wrote to the attorney for Resurgent, defendant's predecessor and the mortgage servicer, and offered to assume the mortgage. (DE 29 at ¶ 7; DE 29-1 at 13.) In his reply, counsel explained that, although "[t]he language contained in the Note does not preclude an assumption, but that would have to be initiated by Mr. Tiffany[.]" (DE 29-1 at 14; DE 29 ¶ 8.) Tiffany and the Simses subsequently agreed to move forward, and Tiffany's attorney wrote to Resurgent's counsel on March 17, 2010, to indicate that Tiffany was amenable to an assumption and asking what paperwork was needed. (DE 29-1 at 17; DE 29 ¶ 12.) It's unclear what, if any, correspondence passed between Resurgent and Tiffany or the Simses after that. The complaint alleges that Resurgent never sent the assumption paperwork, but says nothing about whether Tiffany or the Simses made additional inquiries before 2014. (DE 29 ¶¶ 14–15.) In the meantime, the foreclosure ostensibly continued.

In June 2011, Tiffany filed for chapter 7 bankruptcy protection, which had the

2

effect of staying the foreclosure proceedings and led the Simses to file a related case against Tiffany. *See In re Tiffany,* No. 3:11-32492 (Bankr. N.D. Ind. June 22, 2011); *Sims v. Tiffany (In re Tiffany)*, No. 3:11-03045 (Bankr. N.D. Ind. July 20, 2011). The Simses ultimately settled their case against Tiffany, and Tiffany executed a quitclaim deed in the Simses' favor on March 13, 2012. (DE 29-1 at 11; DE 29 ¶ 15.) Neither the lender nor Resurgent/Shellpoint was a party to the deed, even though the mortgage on the home was still outstanding. (DE 29-1 at 11.)

In October 2012, the bankruptcy court lifted the stay, allowing the foreclosure proceedings to resume. *In re Tiffany*, No. 3:11-32492 (Bankr. N.D. Ind. Oct. 31, 2012) (DE 82). Summary judgment was granted the following year in favor of the bank, and the court ruled that "[t]he mortgage . . . is hereby foreclosed as a valid and paramount lien and the equity of redemption of . . . Tiffany Sims [and] Mario Sims is hereby foreclosed with respect to the described real property[.]" (DE 19-1 at 49.) The court further provided for the property to be sold by the sheriff with proceeds going to satisfy the sum due to the bank and that, at the bank's request "the Sheriff shall evict any Defendants, and any person . . . found occupying the premises[.]" (*Id.* at 50.)

On December 10, 2014, Shellpoint sent a letter to the Simses, stating that the unpaid principal on the loan was $126,257.96 and "that Shellpoint has made contact with [Tiffany] and will begin the process of a mortgage assumption[.]"(DE 29-1 at 32.) The letter also provided a list of documents Shellpoint needed to begin its review. (*Id.*) The Simses allege they submitted the paperwork within five days and that, if it didn't

3

already know, Shellpoint would have learned from that paperwork that the Simses are African-American. (DE 29 ¶ 16.)

In the meantime, a sheriff's sale of the property was scheduled for January 8, 2015. (DE 29 ¶ 28; *see also* DE 2-1 at 33.) The Simses' attorney asked Shellpoint to postpone the auction for 30 days to allow them to complete the assumption process, and he filed a complaint with the Consumer Financial Protection Bureau with the same request. (DE 29 ¶¶ 28–29; DE 2-1 at 35.) Shellpoint responded on January 30, 2015, agreeing to postpone the foreclosure sale "in an effort to allow you to submit the documentation that we previously requested . . . [on] December 10, 2014." (DE 29 ¶ 30; DE 2-1 at 37.) Shellpoint's letter also included the following caution:

> Please be advised that Shellpoint is not responsible for any written or verbal agreement and or monetary exchanges between yourself and the mortgagor, John Tiffany, as we solely service the referenced loan in accordance with the original loan agreement and all applicable state laws and federal regulations until such time as the loan has been paid in full, settled for less than the total amount, or foreclosed and liquidated.

(*Id.*) The Simses say they then resubmitted the paperwork they'd sent in December 2014. (DE 29 ¶¶ 32, 34.)

On March 6, 2015, Shellpoint responded to the Simses' consumer complaint, stating that Shellpoint could not disclose certain information about the mortgage including "the total amount required to reinstate the mortgage obligation" until it received authorization from Tiffany and that the Simses would "be required to reinstate the loan by paying the total amount due prior to assuming the rights and obligations

under the promissory note and security instrument." (DE 2-1 at 41; DE 29 ¶ 32.) The March 6th letter also asked the Simses to provide updated financial paperwork and the executed quitclaim deed for the property. (DE 2-1 at 41.) Finally, the letter warned the Simses that Shellpoint could reschedule and complete a foreclosure sale consistent with the terms of the original agreement and applicable law, if it did not receive the requested documentation within 30 days. (*Id.* at 42.)

The Simses then lodged a second complaint with the Indiana Consumer Financial Protection Bureau, which requested a postponement of the sale, asked that "some portion of the funds we paid Mr. Tiffany to be credited to the loan's remaining balance[,]" and alleged violations of Dodd-Frank Wall Street Reform and Consumer Protection Act. (DE 29 ¶ 38; DE 2-1 at 51.) After this second consumer complaint, the Simses say Shellpoint really started giving them a hard time—for example, by refusing to discuss the mortgage with the Simses without further information, hanging up on them, and failing to return calls, emails, and letters. (DE 29 ¶ 39.)

Shellpoint formally responded to the Simses' second consumer complaint on June 24, 2015, stating that "[i]n order for Shellpoint to allow you to assume the mortgage, you will be required to reinstate the loan" and that "Shellpoint does not allow third party assumptions on loans reflecting a delinquent status." (DE 2-1 at 51; DE 29 ¶ 38.) The June 24th letter also stated that the sheriff's sale was set for July 23rd and that it would not be canceled. (DE 2-1 at 51.)

All of this led the Simses to file this cause of action *pro se* and to seek a temporary

5

restraining order to stall the sheriff's sale. (DE 1; DE 2; DE 9.) The sheriff's sale was subsequently cancelled, and I denied the request for a TRO. (*See* DE 13.) At that time, I advised the Simses that they could refile their TRO request if the sheriff's sale were reset. (*Id.*) Nothing in the pleadings suggests that ever happened, and plaintiffs' contact information as shown on the docket indicates that they continue to live at the property.

## Discussion

Shellpoint has moved to dismiss the Simses' Verified Third Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs, but I am not required to accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citation omitted). And I must dismiss the plaintiffs' claims if the factual allegations only show a "sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). But I am mindful that because the Simses are *pro se*, I must construe their complaint liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### *Count One: Fair Housing Act Claim*

Count One is a new claim alleging Shellpoint discriminated against the Simses in violation of the Fair Housing Act. (*See* DE 19 at 15–17.) I dismissed a prior

6

discrimination claim brought under 42 U.S.C. § 1981, in part because it did not "plausibly allege that Shellpoint intended to discriminate and [did] not provide any facts from which I can infer such an intent." (DE 28 at 15; *see also* DE 15 ¶¶ 67–68.) Although the Simses have reframed these allegations, they still fail to "nudge [their] claims of invidious discrimination across the line from conceivable to plausible[.]" *Iqbal*, 556 U.S. at 680 (internal quotation marks and citations omitted).

To allege a plausible claim under the FHA, the Simses must allege that Shellpoint acted with the intent to discriminate or that its actions had a disparate impact on African-Americans. *See Bloch v. Frishholz*, 587 F.3d 771, 784 (7th Cir. 2009); *see also generally* 42 U.S.C. § 3604. The complaint alleges that Shellpoint "burden[ed] the Sims' efforts to assume the mortgage, because of their race and color[,]" but it alleges no *facts* supporting that conclusion. (*See* DE 29 ¶¶ 3–46, 71–72.) And "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 686. Nor are the Simses' vague allegations that an agent made "[d]iscriminatory admissions and other statements" on an unspecified date or that Shellpoint knew of the Simses' race in 2010 sufficient to support an inference that Shellpoint intended to discriminate against the Simses because of their race. (*See* DE 29 ¶¶ 71–72.) In short, the Simses have failed for the second time to say exactly what makes them think that Shellpoint intentionally discriminated against them. Count One must be dismissed.

*Counts Two and Four: Contract-Based Claims*

The new complaint also alleges three counts against Shellpoint that require the existence of an enforceable contract between Shellpoint and the Simses: (a) violation of the Simses' civil right to make an enforce contracts under 42 U.S.C. § 1981 (Count Two); (b) tortious interference with a contract (Count Three), which is discussed in the next section; and (c) breach of contract (Count Four). (*See* DE 29 at 17–21; *see also Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003) (stating that section 1981 claims require a contractual relationship).)

Under Indiana law, an enforceable contract requires offer, acceptance of the offer, consideration, and a meeting of the minds on all essential terms. *Ind. Dep't of Corrs. v. Swanson Srvcs. Corp.*, 820 N.E.2d 733, 737 (Ind. Ct. App. 2005). The Simses allege that an enforceable contract was created when Shellpoint sent the December 2014 letter listing documents needed for the assumption process and the Simses completed the paperwork. (DE 29 ¶¶ 82–83 (also alleging the purported contract obligated Shellpoint to process the paperwork).)

I disagree. Nothing on the face of the December 2014 letter suggests that Shellpoint intended the letter to be an offer for an enforceable contract. (*See* DE 29-1 at 32–33; DE 2-1 at 30–31.) The letter was not "reasonably definite and certain in its material terms so that the intention of the parties may be ascertained[,]" and it did not "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Wenning v. Calhoun,* 827 N.E.2d 627, 629 (Ind. Ct. App. 2005) (internal

8

quotation marks and citations omitted). In addition, nothing in the pleadings suggests that the Simses gave any consideration. At best—and even this is a stretch—the Simses and Shellpoint agreed to enter a contract for assumption later, but such an "agreement to agree at some future time is not enforceable." *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996) (citing *Wallace v. Mertz*, 156 N.E. 562 (Ind. 1927)). There's simply nothing here to suggest a binding contract existed between the Simses and Shellpoint.

In addition, the section 1981 discrimination claim in Count Two suffers from the same infirmity as the FHA discrimination above because the complaint does not plausibly allege that Shellpoint intended to discriminated and provides no facts from which I can infer such an intent. *See Morris v. Office* Max, Inc., 89 F.3d 411, 414 (7th Cir. 1996) (stating that claims under section 1981 require intentional discrimination).

For these reasons, Counts Two and Four must be dismissed.

*Count Three: Tortious Interference*

Count Three alleges that Shellpoint interfered with their contract with "Tiffany to purchase or assume the mortgage on 23778 Grove Street" in December 2015 and "rendered impossible the performance of the contract between the Sims and Tiffany without justification[.]" (DE 29 ¶¶ 89–91.) Under Indiana law, tortious interference requires "1) existence of a valid and enforceable contract, 2) defendant's knowledge of the contract's existence, 3) defendant's intentional inducement of breach of contract, 4) the absence of justification, and 5) damages resulting from defendant's wrongful inducement of breach." *Williams v. Seniff,* 342 F.3d 774, 792 (7th Cir. 2003) (internal

9

quotation marks and citation omitted).

There are a number of problems with this claim, including that it does not plausibly allege an enforceable contract for the assumption of the mortgage. As discussed previously, an enforceable contract requires an offer, acceptance of that offer, consideration, and a meeting of the minds on all essential terms. *Swanson Srvcs.*, 820 N.E.2d at 737. The complaint fails to plead—or even hint—at any of that. (*See generally* DE 29 ¶¶ 10, 41, 89–91.) The complaint does incorporate a letter from Tiffany's attorney about the purported agreement, but that falls short too and merely stating that Tiffany was "willing to work toward a resolution in which Mr. and Mrs. Sims take over his obligation with the bank." (DE 29-1 at 17.) This is insufficient to show that Tiffany and Simses had an enforceable contract for the assumption of the mortgage.

But let's suppose that Tiffany somehow was contractually bound to allow the Simses to assume his mortgage. Even then, Shellpoint's conduct could not constitute tortious interference because the complaint does not allege Tiffany ever breached the contract. *See Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 922 (Ind. Ct. App. 2002) (stating that a breach is required for tortious interference). In fact, according to the complaint, Tiffany did everything he was arguably obligated to do when he advised Shellpoint that he did not object to the Simses' assumption of his mortgage and asked what paperwork was needed. (*See* DE 29 ¶ 10; DE 29-1 at 17.) The allegations in the complaint thus undercut any claim for tortious interference. Count Three must be dismissed.

*Counts Five and Six: Indiana Deceptive Consumer Sales Act (IDCSA) Claims*

The Verified Third Amended Complaint alleges two counts under the IDCSA. The statute aims to "encourage the development of fair consumer sales practices," and to that end, it provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code §§ 24-4-0.5-1, 24-5-0.5-3 (2014). Counts Five and Six allege that Shellpoint made misrepresentations that constituted deceptive acts under the IDCSA "[b]y representing . . . that Shellpoint would allow them to apply for an assumption of the delinquent mortgage, when it had no intent on allowing the assumption[.]" (DE 29 ¶¶ 105, 109.) I dismissed the prior version of this claim, which alleged that Shellpoint committed a deceptive act by "demanding payment" of Tiffany's debt, because the alleged conduct was not a "deceptive act" as defined in the statute. *See* Ind. Code § 24-4-0.5-3(b) (2014). Although this complaint again alleges a deceptive act, it's clearer this time around that what the Simses intended to allege is that Shellpoint violated the IDCSA by *omitting* the following paragraph (which was in the March 2015 letter) from its December 10, 2014 correspondence:

> While additional documentation is needed to complete the review process, which is outlined below, please advised that your approval will also be contingent upon your ability to reinstate the loan. In summary you will be required to reinstated the loan by paying the total amount due prior to assuming the rights and obligations under the promissory note and security instrument.

(DE 2-1 at 41; *see also* DE 29 ¶ 17; DE 2-1 at 30.)

Shellpoint argues these allegations are insufficient to allege a plausible claim because an omission cannot violate the IDCSA. (DE 30 at 10.) That's almost correct: prior versions of the statute required an express misrepresentation and did not apply to implicit misrepresentations or omissions. *See Berghausen v. Microsoft Corp.*, 765 N.Ed.2d 592, 598 (Ind. Ct. App. 2002); *see also, e.g.,* Ind. Code §§ 24-5-0.5-3(a) (2013). However, the Indiana legislature expanded the law in 2014 to cover omissions, and the broader version of the statute took effect in July 2014. *See* Ind. Code. 24-5-0.5-3(a) (2014). So, theoretically, an omission made by Shellpoint in December 2014 could have violated the IDCSA.

Nevertheless, there is no plausible IDCSA claim here because the complaint pleads no facts to support the notion that Shellpoint's omission was "unfair, abusive, or deceptive" in any way. The IDCSA isn't a blanket prohibition on non-disclosure of information; the non-disclosure must be unfair in some sense. Here, the December 2014 letter makes clear that the next step in the process was for Shellpoint to review the Simses' paperwork and determine whether they met Shellpoint's lending requirements. None of Shellpoint's likely numerous lending requirements (such as sufficient income and debt-to-income ratio) were disclosed in the December 2014 letter, and Shellpoint made no representation whatsoever about the likelihood that the Simses would be approved. Under these circumstances, Shellpoint's failure to mention one requirement of approval cannot reasonably be viewed as unfair, abusive, or deceptive. This claim might have survived if Shellpoint had promised to approve the Simses in the letter but

12

omitted the requirements for approval, but that wasn't the case here. Counts Five and Six must be dismissed.

*Count Seven: Fair Debt Collection Practices Act (FDCPA) Claim*

Count Seven of the complaint alleges that Shellpoint is a debt collector who violated the FDCPA by falsely respresenting "that the Sims had to pay Tiffany's debt to assume the home, when the Note and the December letter . . . made no such condition[.]" (DE 29 ¶ 113.) The FDCPA is a federal statute that "prohibits a debt collector from using certain enumerated collection methods in its effort to collect a 'debt' from a consumer." *Jenkins v. Heintz*, 124 F.3d 824, 828 (7th Cir. 1997) (internal citation and quotation marks omitted). Shellpoint argues that the Simses' FDCPA claim is insufficiently pleaded and must be dismissed because it fails to allege a false or misleading representation prohibited under the FDCPA. (DE 30 at 11.)

I agree. The Verified Third Amended Complaint alleges that Shellpoint falsely represented "that the Sims had to pay Tiffany's debt to assume the home, when the Note and the December letter . . . made no such condition[.]" (DE 29 ¶ 113.) The complaint does not plausibly allege that this representation was false given that the mortgage reserved the lender's right to "require immediate payment in full of all sums" if the property was sold without the lender's prior written consent. (*See* DE 29 ¶ 8; DE 32-1 at 10.) In addition, and as I noted when I dismissed the prior complaint, the Simses don't appear to count as "consumers" entitled to protection under the statute. (*See* DE 28 at 20; *see also* 15 U.S.C. § 1692a(6).) Under the FDCPA, a "consumer" is

13

someone "obligated or allegedly obligated to pay a debt[,]" but the Simses are not and have never been obligated to pay Tiffany's debt. *See id.* They could walk away from Tiffany's debt at any point. Accordingly, the complaint does not allege a plausible FDCPA claim, and Count Seven must be dismissed.

*Counts Eight: Dodd-Frank Wall Street Reform & Consumer Protection Act Claim*

Count Eight is a new claim alleging alleges that Shellpoint violated a duty of care imposed by the Dodd-Frank Wall Street Reform and Consumer Protection Act by failing "to have all of its employees that assisted the Sims in applying for the assumption to be qualified mortgage originators and failed to include the unique qualifier on its documents[.]" (DE 29 ¶¶ 116, 118.) This claim is not viable. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979). While there is no doubt that Dodd-Frank creates a private cause of action for whistleblowers, courts have been reluctant to find that Dodd-Frank created any other private cause of action. *See Regnante v. Sec. & Exch. Officials,* 134 F. Supp. 3d 749, 760–61 (S.D.N.Y. 2015) (collecting cases and discussing courts' reluctance to read a private cause of action into Dodd-Frank). And the complaint fails to identify any language in Dodd-Frank that suggests a different course of action here. Count Eight must be dismissed.

*Count Nine: Equal Credit Opportunity Act Claim*

Count Nine, alleging discrimination in violation of the Equal Credit Opportunity

Act, is also new. (*See* DE 29 ¶¶119–21.) The ECOA prohibits creditors from discriminating against "applicants" on the basis of race and, if credit is denied or another "adverse action" is taken, requires creditors to set out its reasons for the action. 15 U.S.C. § 1691(a). The Simses allege that Shellpoint discriminated against them by "imposing] different terms and conditions on the loan assumption tha[n] required by the Note, requiring them to pay Tiffany's debt prior to assuming the loan[,]" and "stat[ing] that they would not offer an assumption to the Sims." (DE 29 ¶ 121.) They also allege that Shellpoint violated the ECOA by failing to inform them within 30 days of completing their application that it was rejected. (*Id.* ¶ 122.)

Shellpoint argues this claim must be dismissed because the Simses, who "merely sought to assume Tiffany's existing loan, rather than obtain additional credit[,]" were not "applicants" under the statute. (DE 30 at 13 (citing 15 U.S.C. § 1691a(b)).) I think this is too narrow a reading of the statute. The regulatory definition of "applicant" is broad and "means any person who requests . . . an extension of credit . . . includ[ing] any person who is or may become contractually liable." *Davis v. Wells Fargo Bank*, 633 F.3d 529, 538 (7th Cir. 2011) (citing 12 C.F.R. § 202.2(e)). The Simses have alleged that they "completed the assumption paperwork in January 2015[,]" and that allegation, is sufficient to show that they were applicants at the motion to dismiss stage.

Shellpoint also argues that a denial of the Simses' application could not violate the ECOA because the statute defines "adverse action" to exclude refusals to extend additional credit where *the loan* is already in default. (DE 30 at 13 (emphasis added).)

15

This interpretation misreads the statute, which states that "adverse action . . . does not include a refusal to extend additional credit under an existing credit arrangement where *the applicant* is delinquent is otherwise in default[.]" 15 U.S.C. 1691(d)(6) (emphasis added). Although there's no question that Tiffany's mortgage was in default, but the *applicants* under the ECOA—the Simses—were not. In addition, the Simses' application to assume Tiffany's mortgage was not a request for "additional credit under an existing credit arrangement[.]" *See id.* For these reasons, a rejection of the Simses' assumption application could constitute an adverse action under the ECOA.

Accordingly, while it remains to be seen whether the Simses can prove an ECOA violation, Count Nine is sufficiently pleaded to notify Shellpoint of the Simses' allegations and to make the right to relief under the ECOA more than speculative. *See Twombly*, 550 U.S. at 555. The motion to dismiss Count Nine claim is denied.

## Conclusion

As outlined above, Shellpoint's motion to dismiss (DE 30) is **GRANTED** with respect to Counts One through Eight, and those counts are **DISMISSED WITH PREJUDICE**. The motion to dismiss is **DENIED** with respect to Count Nine.

**SO ORDERED.**

ENTERED: November 8, 2016.

                                          s/ Philip P. Simon
                                          CHIEF JUDGE
                                          UNITED STATES DISTRICT COURT