UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MARIO L. SIMS, *et al.*,                )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )        CAUSE NO. 3:15-cv-263-MGG
                                        )
NEW PENN FINANCIAL LLC d/b/a            )
SHELLPOINT MORTGAGE                     )
SERVICING,                              )
                                        )
            Defendant.                  )

**OPINION AND ORDER**

Through this case, Plaintiffs, Mario and Tiffiny Sims ("the Simses"), proceeding *pro se*, allege violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq*., against Defendant, New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint").[1] The undersigned retains jurisdiction over this case based on the parties' consent and 28 U.S.C. § 636(c). [DE 40].

The Simses' ECOA claim arises from the fallout following a mortgage default. The Simses, who are both African-American, entered a land sale contract with John Tiffany in the fall of 2008 to purchase a home. While under contract with the Simses, Tiffany remained obligated under a mortgage loan governed by the terms of an Adjustable Rate Note. After the Simses moved into the home and made payments to Tiffany under the terms of the land sale contract, Tiffany stopped making his mortgage payments around May 2009 leading to foreclosure and bankruptcy proceedings. The Simses began efforts to assume Tiffany's mortgage but never succeeded. In this action, the Simses allege that

---

[1] Counts 1–8 of Plaintiffs' Third Amended Complaint were dismissed with prejudice by this Court on November 8, 2016. [DE 34]. Only Count 9 regarding violation of the ECOA remains before the Court.

Shellpoint, the company that serviced Tiffany's loan beginning in March 2014,[2] violated the ECOA by discriminating against them in the assumption process based on their race. Specifically, the Simses allege that Shellpoint delayed for four years in providing them with the necessary assumption paperwork; discouraged their assumption application by requiring them to produce the same information multiple times; and treated them differently than non-minority applicants by requiring them to reinstate Tiffany's delinquent loan, allegedly contrary to the terms of Tiffany's promissory note and Shellpoint's assumption policy.

After the discovery period closed, Shellpoint timely filed the instant motion for summary judgment on November 30, 2017. Now ripe, Shellpoint's motion for summary judgment hinges partially on whether the Simses' assumption efforts even trigger the ECOA. Should the ECOA apply, the critical question becomes whether the Simses have presented evidence of discriminatory intent sufficient to create a triable issue of fact. Before reaching the merits of the Simses' claim, however, the Court must address Shellpoint's challenge to the admissibility of evidence attached to the Simses' response brief.

## I. ADMISSIBILITY OF THE SIMSES' EXHIBITS

Before considering the merits of Shellpoint's motion for summary judgment, the Court must address Shellpoint's allegations[3] that the Simses' exhibits 1, 2, 3, 6, 7, and 9,

---

[2] The Bank of New York Mellon f/k/a The Bank of New York as Trustee for Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2005-BC5 owned Tiffany's loan when Shellpoint took over service from Resurgent Mortgage Servicing in March 2014. [DE 73-1 at 2, ¶ 1].

[3] Shellpoint challenged the authenticity and admissibility of the Simses' exhibits in its original reply brief [DE 86] related to the instant motion for summary judgment. Due to the excessive length of the Simses' original response brief [DE 85], the Court afforded them time to file an amended response, which they did on March 9, 2018 [DE 102]. The Court also afforded the Simses time to cure any defects in their original exhibits in light of Shellpoint's evidentiary challenges. [DE 93]. Accordingly, the Simses filed a supplemental evidentiary brief regarding Shellpoint's claims of inadmissibility on March 9, 2018. [DE 101].

attached to their original response brief, were not authenticated by affidavit or otherwise and therefore should not be considered in determining whether a genuine dispute of material fact exists to overcome the instant motion for summary judgment. [DE 86 at 5]. Alternatively, Shellpoint asks the Court to strike the Simses' exhibits 1, 2, 3, 6, 7, and 9 for lack of proper authentication citing Fed. R. Civ. P. 56(e). [Id. at 5, n.10].

As allowed by the Court, the Simses filed a Declaration along with its supplementary evidentiary brief on March 9, 2018. [DE 101 at 6–7]. In their Declaration, the Simses describe their personal knowledge of the challenged exhibits; report that the challenged exhibits were all included in their Verified Third Amended Complaint; and explain that they testified under oath about all the challenged exhibits at their depositions. [Id. at 6]. Moreover, the Simses indicate that the authors of the exhibits are all included on their witness list and can testify at trial as to the authenticity of the exhibits. [Id. at 7].

In so doing, the Simses have overcome some of Shellpoint's authentication challenges. First, the Simses' have now provided the equivalent of an affidavit—in the form of their Declaration and their Verified Third Amended Complaint—reflecting their alleged personal knowledge of all the exhibits. See Fed. R. Civ. P. 56(c)(1)(A) (identifying affidavits or declarations as one type evidence that can be used to support an assertion of a genuine dispute of material fact); Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996) (explaining that a verified complaint is the equivalent of an affidavit for summary judgment purposes because it "contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertions."

_____

Shellpoint then filed a second reply on March 19, 2018, responding to both the Simses' amended response and their supplemental evidentiary brief. [DE 104].

Second, the Simses have demonstrated that they are prepared to authenticate the exhibits and establish their admissibility at trial. Under Fed. R. Civ. P. 56(c)(2), Shellpoint may object to the Simses' exhibits based on an argument that they "cannot be presented in a form that would be admissible in evidence." "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp. 3d 940, 947–48 (N.D. Ind. 2016) (quoting *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015)). Moreover, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (emphasis in original).

Here, the Simses are not only prepared to testify at trial as to their own personal knowledge of the facts included in the challenged exhibits, but are also prepared to solicit testimony about the exhibits from their authors, who have already been included on the Simses' witness list. With such testimony, the Simses could overcome any authentication issues. *See* Fed. R. Evid. 901(b)(1). Indeed, "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). Similarly, the testimony of witnesses with personal knowledge of the exhibits could overcome any alleged hearsay issues. Accordingly, the Sims should be given the opportunity present their evidence in an admissible form at trial, especially with regard to their exhibits 1, 2, 3, 6, and 7. *See Rodgers,* 167 F. Supp. 3d at 947.

Yet in its second reply, Shellpoint further challenges the Simses' exhibits 8 and 9 as inadmissible. Exhibits 8 and 9 are exhibits and discovery responses from proceedings in other courts related to the Tiffany loan that Shellpoint argues must be certified under Fed. R. Civ. 902(4) in order to be authenticated. Once again, however, nothing precludes the Simses from providing such certification at trial. Accordingly, exhibits 8 and 9 should not be stricken.

Lastly, "[m]otions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party." *Rodgers*, 167 F. Supp. 3d at 948. Nothing in the record suggests that Shellpoint will be prejudiced by inclusion of all of the Simses' exhibits as part of the Court's summary judgment analysis.

Therefore, the Simses may oppose Shellpoint's motion for summary judgment with the support of all their exhibits, even if ultimately determined to be inadmissible, because they have either been authenticated through the Simses' Declaration and Verified Third Amended Complaint or can be presented at trial in an admissible form. Shellpoint's request to strike the Simses' exhibits 1, 2, 3, 6, 7, and 9 is denied.

## II.  RELEVANT BACKGROUND

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

As noted above, the Simses entered a land contract with John Tiffany for a home upon which Tiffany held a mortgage loan serviced originally by Resurgent Mortgage Servicing ("Resurgent"). Under the terms of Tiffany's Adjustable Rate Note on the

mortgage loan, the lender retained the option to "require immediate payment in full of all sums secured by this Security Instrument" in the event that any part or all of the property were sold or transferred without the Lender's prior written consent.  [DE 73-1 at 9].

However, the Lender would be prohibited from exercise of this option if:

> (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to the Lender.

[*Id.* at 9].  Tiffany's Note included additional terms related to any assumption of the loan.  Specifically, the Note stated that the "Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption" and that "Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument."  [*Id.* at 9].

When Tiffany's default on the mortgage loan led to a foreclosure action that could have resulted in the Simses' eviction from the property, the Simses sent a letter entitled "RULE 408 Settlement Letter" to Resurgent's attorney, David Bengs, and Tiffany's attorney, Peter Agostino, on January 28, 2010.  [*See* DE 102 at 31].  In that letter, the Simses proposed resolving their counter and cross claims in Tiffany's foreclosure action by "assuming Mr. Tiffany's obligation with the bank . . . ."[4]  [*Id.*].  In an email dated February 22, 2010, Attorney Bengs responded to the Simses stating that "[t]he language in [Mr. Tiffany's] Note does not preclude an assumption," but recommended that the Simses

---

[4] The Simses also proposed an alternative resolution whereby the bank would agree to accept a promissory note from them with specific terms laid out in the letter.  [DE 102 at 31].  This alternative solution is not relevant to the instant action and therefore is not discussed further.

"complete a standard purchase from Mr. Tiffany and pay [Resurgent's] lien." [*Id.* at 33].

Mr. Bengs also noted that an assumption "would have to be initiated Mr. Tiffany" to be approved. [*Id.*]. On March 17, 2010, Tiffany's attorney, Mr. Agostino, sent a brief two-sentence letter to Mr. Sims and Attorney Bengs formally reporting Mr. Tiffany's approval of the Simses' efforts to initiate an assumption of his loan and asking Mr. Bengs advise what paperwork would be needed to proceed with the assumption application. [*Id.* at 35].

After Mr. Agostino sent his letter to Mr. Bengs, the Simses met Mr. Bengs face-to-face for the first time at hearings in 2010 related to the foreclosure proceedings. Among the subsequent events were a settlement agreement between Tiffany and the Simses and the 2012 execution of a Quit Claim Deed for the property at issue to the Simses. However, the Simses never received the assumption paperwork requested in Mr. Agostino's March 2010 letter. On May 31, 2013, an in rem judgment was issued against Tiffany foreclosing his mortgage and ordering sale of the property. [DE 73-1 at 41–42].

In March 2014, Shellpoint succeeded Resurgent at the servicer of Tiffany's mortgage loan. Shellpoint appears to have become aware of the Simses' interest in applying to assume Tiffany's mortgage loan shortly thereafter upon requests from the Simses to postpone the foreclosure sale that had been scheduled. In response, Shellpoint's Escalations Department sent Mr. Sims a letter on December 10, 2014 ("the December 2014 Letter"), "confirm[ing] that Shellpoint [had] made contact with the mortgagor and [was beginning] the process of a mortgage assumption." [*Id.* at 45]. The December 2014 Letter also included a list of all the documentation that Shellpoint required from the Simses as part of the assumption process. [*Id.*]. The Simses submitted 75 documents in response. [DE 29 at 5, ¶ 16].

On January 6, 2015, the Simses filed their first complaint regarding Shellpoint with the Consumer Financial Protection Bureau ("CFPB") seeking postponement of the foreclosure sale pending resolution of the assumption application. Shellpoint sent Mr. Sims a second letter dated January 30, 2015 ("The January 2015 Letter"), confirming that the foreclosure sale had been postponed to allow the Simses time to submit the documentation requested in the December 2014 Letter. [DE 73-1 at 48]. On March 6, 2015, Shellpoint sent Mr. Sims a third letter ("the March 2015 Letter") explicitly responding to the Simses' first CFPB complaint. The March 2015 Letter explicitly stated that "Shellpoint require[d] a signed, dated letter from John Tiffany authorizing [the Simses] to obtain details regarding the mortgage obligation" consistent with a phone call between Mr. Sims and Shellpoint's loss mitigation representatives on March 5, 2015, regarding the need for this documentation. [*Id.* at 51].

The March 2015 Letter also confirmed that Shellpoint would evaluate the Simses' eligibility for the assumption, but outlined specific documentation that had yet to be received and advised that "approval [would] also be contingent upon [the Simses'] ability to reinstate the loan." [*Id.*]. In conclusion, the Letter stated:

> At this time, Shellpoint's foreclosure proceedings remain on hold. However, we respectfully request that you send the required documentation to Shellpoint's Loss Mitigation Department . . . . Upon the receipt of all of the required documentation, Shellpoint will evaluate your eligibility for an assumption and notify you of the outcome.
>
> If Shellpoint does not receive all of the requested documentation within thirty (30) days of the date of this response, it may resume servicing the loan pursuant to the original agreement and applicable law. This may include the scheduling and subsequent completion of a foreclosure sale if warranted.

[*Id.* at 52]. Afterward, the Simses re-submitted the same 75 pages of documents for what appears to have been the third time. Yet, the Simses never brought Tiffany's loan current.

In June 2015, based on the Simses' allegedly incomplete assumption application, Shellpoint scheduled a foreclosure sale for July 23, 2015.

Upon receipt of the notice of the foreclosure sale, Mr. Sims contacted Shellpoint by telephone and again submitted the 75 documents to a Shellpoint employee, K'tia Cox, as directed. Mr. Sims testified under oath at his deposition that Ms. Cox was African-American and that during a phone call, she said to him: "These people, you know how they treat us." [DE 102 at 90, 136:7–8].

On June 9, 2015, the Simses filed a second CFPB complaint against Shellpoint asking that funds they paid Mr. Tiffany as part of their land sale contract be credited to the mortgage's remaining balance; that the foreclosure sale be cancelled; and that they be permitted to assume Tiffany's mortgage. [*See* DE 73-1 at 54]. The Simses continued their assumption efforts by resending the same 75 documents again and by making multiple phone calls to individuals at Shellpoint, who evidently had authority to address his concerns but never responded to his voicemails. Other Shellpoint employees told Mr. Sims they were not authorized to discuss the assumption with him.

On June 24, 2015, Shellpoint responded to the second CFPB complaint with another letter ("the June 2015 Letter") to the Simses (1) informing them that "Shellpoint does not allow third party assumptions on loans reflecting a delinquent status;" (2) reiterating the gaps in the their documentation as set forth in the March 2015 Letter; (3) stating that Shellpoint could only allow them to assume the mortgage if they reinstated the loan; and (4) explaining that Shellpoint could not credit Tiffany's loan as requested because it had not authorized the land sale contract." [*Id.*]. The Simses submitted nothing further to Shellpoint and initiated this action by filing a complaint the next day, June 25, 2015.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322–23; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence

it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

## B. Plaintiffs' ECOA Claim

The ECOA prohibits a creditor from "discriminat[ing] against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race . . . ." 15 U.S.C. § 1691(a)(1). To succeed on an ECOA claim, plaintiffs must establish that they were "applicants," as defined by the Act, and that the creditor treated them less favorably because of their race. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 538 (7th Cir. 2011). The ECOA defines the term "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). Prohibited conduct by lenders under the ECOA includes

> - Fail[ure] to provide information or services or provide different information or services regarding any aspect of the lending process, including credit availability, application procedures, or lending standards;
>
> - Discourag[ing] or selectively encourage[ing] applicants with respect to inquiries about or applications for credit;
>
> - Refus[ing] to extend credit or use different standards in determining whether to extend credit;
>
> . . .; or
>
> - Treat[ing] a borrower differently in servicing a loan or invoking default remedies . . . .

Policy Statement on Discrimination in Lending, 59 FR 18,266, 18,268 (Apr. 15, 1994).

The ECOA also requires creditors, among other things, to "notify the applicant of its action on the application" within thirty days "after receipt of a completed application for credit."

15 U.S.C. § 1691(d)(1).  Moreover, the ECOA requires creditors to provide applicants

against whom an adverse action is taken with a statement of specific reasons for the

adverse action.  15 U.S.C. § 1691(d)(2)–(3).

### 1.    Applicability of the ECOA

#### a.    The Simses' Status as ECOA "Applicants"

Shellpoint argues that it is entitled to judgement as a matter of law because the

Simses' did not qualify as "applicants" under the ECOA.  Shellpoint contends that they

were not applicants because they failed to timely submit all the required materials to

complete their assumption application.  Furthermore, Shellpoint contends that even if they

had completed the application, the Simses were not seeking any additional credit or an

extension of credit.  Instead, Shellpoint argues that the terms of Tiffany's mortgage loan

would have remained the same if the assumption had been approved.

The Simses, on the other hand, argue that they were indeed "applicants" under the

ECOA citing to multiple dictionaries defining the verb "apply" to mean "to make a formal

request" and *Estate of Davis v. Wells Fargo Bank* in support.  [DE 102 at 16–17].  In *Estate

of Davis*, the court held that the plaintiff qualified as an "applicant" under the ECOA based

on the fact that the defendant lender had offered the plaintiff a loan modification that would

have extended her credit beyond the scope of her existing mortgage loan in the face of

potential foreclosure.  633 F.3d at 538.  In other words, the terms of the plaintiff's original

loan would have been changed by the modification she sought.  As such, the court found

the plaintiff's situation consistent with the definition of an ECOA "applicant" in 12 C.F.R.

§ 202.2(e), which states that an applicant is "any person who requests or who has received

an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit."

Despite the Simses' hopes, *Estate of Davis* does not confirm their status as "applicants" in this case. Unlike the Simses, the *Estate of Davis* plaintiff already held a mortgage loan and was seeking a modification of the terms of her own mortgage. The Simses were simply seeking to assume Tiffany's loan under the same terms he agreed to when the loan was originated. As such, the Simses have not shown how their requested assumption would have extended credit beyond the terms of Tiffany's loan.

From the other side, Shellpoint relies upon this Court's decision in *Crawford v. Countrywide Home Loan, Inc.* to support its argument that the Simses were not "applicants." No. 3:09CV247-PPS-CAN, 2010 WL 3273715 (N.D. Ind. Aug. 16, 2010), *vacated on other grounds,* 647 F.3d 642 (7th Cir. 2011). In *Crawford*, the plaintiffs raised many claims, including an ECOA claim, against their lender after facing a foreclosure judgment related to their mortgage loan. *Id.* at *2–*3. In addressing the *Crawford* plaintiffs' claim, the Court stated that the "ECOA applies to the early stages of loan origination, prohibiting lenders from discriminating against [specific categories of people] when considering the creditworthiness of loan applicants." *Id.* at *7. In *Crawford*, however, the facts had nothing to do with loan origination or the original closing of the mortgage loan. *Id.* Therefore, the Court held that there was no viable ECOA claim. *Id.*

*Crawford* is no more helpful that *Estate of Davis* in determining whether the Simses qualified as "applicants" under the ECOA. Like the plaintiff in *Estate of Davis*, the *Crawford* plaintiffs already held a mortgage loan with the defendant lender. Additionally, this Court in *Crawford* plaintiffs was forced to decide the plaintiffs' ECOA claim without

any allegations or theory applying law to the facts.  *Id.* at *6.  As such, the Court's ECOA analysis in *Crawford* was necessarily limited and provides very little from which the Court can now analogize to the Simses' assumption application.

Looking beyond *Crawford* and *Estate of Davis*, this Court's own research has revealed no authority discussing the applicability of the ECOA to assumption applications. Even without such authority, this much is clear.  The Simses were not seeking additional credit from Shellpoint as the plaintiff in *Estate of Davis* was.  And like the plaintiffs in *Crawford*, the Simses' assumption application had nothing to do with the origination or original closing of the Tiffany loan.  As a result, it appears that the Simses probably were not "applicants" under the ECOA.

### b.   The Simses' Incomplete Assumption Application

Shellpoint also argues that it could not have violated the ECOA's notice and statement-of-reasons requirements found in 15 U.S.C. § 1691(d).  Specifically, Shellpoint contends that it would have only been subject to the requirements if the Simses had completed their assumption application.  An application under the ECOA is "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."  12 C.F.R. § 202.2(f).  And an application for an extension of credit is not "complete" until the "creditor has received all the information it regularly obtains and considers in evaluating applications."  *Riggs Nat'l Bank of Washington, D.C. v. Webster*, 832 F. Supp. 147, 150 (D. Md. 1993) (citing 12 C.F.R. § 202.2(f); *High v. McLean Fin. Corp.,* 659 F. Supp. 1561, 1564 (D.D.C. 1987)).

To show that the Sims did not timely complete their application, Shellpoint cites to the affidavit of Caroline Trinkley, an authorized representative of Shellpoint "familiar with

the manner in which the business records, maintained by Shellpoint for the purpose of servicing consumer mortgage loans, are compiled, maintained, and retrieved." [DE 73-1 at 2]. Ms. Trinkley submitted some of Shellpoint's business records related to the Simses' assumption application, including the December 2014, January 2015, March 2015, and June 2015 Letters, with her affidavit and concluded that "[b]ased on [her] review of [all of] the business records held by Shellpoint, the Simses never provided to Shellpoint a complete package of documents that Shellpoint requested and that was necessary to be considered for a loan assumption." [*Id.* at 4].

To rebut Ms. Trinkley's affidavit and the accompanying business records, the Simses' have merely repeated multiple times that they did submit all the necessary paperwork on multiple occasions. They present no evidence of exactly what they submitted, however. With no such evidence in the record, the Court cannot discern whether the Simses provided Shellpoint with the documents requested in both the December 2014 and March 2015 Letters. Without specific dates of when the Simses submitted the documents they did submit, the Court similarly cannot discern whether the Simses met the 30-day deadline established by Shellpoint in the March 2015 Letter. Nevertheless, Shellpoint still indicated its willingness to consider a completed assumption application, including all the outstanding documentation and reinstatement of the loan, in its June 2015 Letter after the 30-day deadline had passed.

Indeed, Shellpoint as the creditor in this case was entitled to determine the procedures for securing approval for an assumption—as long as those procedures did not discriminate on the basis of prohibited factors, including race, of course. *See Riggs Nat'l Bank of Washington, D.C.*, 832 F. Supp. at 150. Shellpoint informed the Simses of what

was required and what was missing multiple times.  As Ms. Trinkley stated, the Simses failed to submit everything needed to complete the application.  The Simses have not produced any evidence to support their conclusion that the 75 documents they provided multiple times included all the required documentation.

Moreover, the Simses admit they never reinstated the loan.  Instead, the Simses rely upon their oft repeated conclusion that reinstatement of Tiffany's loan was not required for assumption under the terms of Tiffany's Note.  In support, the Simses quote the assumption provision of Tiffany's Note, which states:  "Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument." [DE 102 at 9 (quoting DE 73-1 at 9)].  While it is true the Note does not explicitly require reinstatement of the loan before an assumption, the Note does in fact leave open the possibility of a reinstatement requirement by giving the Lender discretion to craft an assumption agreement it finds acceptable.  As a result, the Simses have also failed to produce evidence that could support a finding that their application was complete without reinstatement.

Accordingly, the Simses unsubstantiated conclusion that their application was complete does not establish a genuine dispute of material fact about the completeness of their assumption.  As such, the notice and statement-of-reasons requirements of the ECOA were likely not triggered by the Simses' incomplete assumption application.

And to the extent that the ECOA might be triggered, the real question is whether the Simses have submitted sufficient evidence of discrimination in the assumption process to survive summary judgment.  *See Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co. LLC*, 476

F.3d 436, 441 (7th Cir. 2007); *see also Estate of Davis*, 633 F.3d at 538 (refusing to remand for a faulty finding that an ECOA plaintiff did not qualify as an "applicant" because the plaintiff had not met her burden to bring forth evidence of discrimination). If the Simses have failed to present a factual record that could not lead a reasonable jury to find in their favor, no genuine dispute of material fact exists to overcome summary judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. In other words, the Simses status as "applicants" or the completed status of their assumption application are of no consequence without evidence of discriminatory intent in violation of the ECOA. *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712 (7th Cir. 1998). Therefore, the Court now turns its attention to the issue of discriminatory intent.

### 2. Discriminatory Intent

Courts have applied the standards of employment discrimination when determining whether a credit applicant has proven discrimination under the ECOA. *See, e.g.*, *A.B. & S. Auto Serv., Inc. v. S. Shore Bank of Chicago*, 962 F. Supp. 1056, 1060 (N.D. Ill. 1997); *see also Saldana v. Citibank, Fed. Sav. Bank,* No. 93 C 4164, 1996 WL 332451, at *2 (N.D. Ill. June 13, 1996); Charlotte E. Thomas, *Defending a Free Standing Equal Credit Opportunity Act Claim,* 114 Banking Law Journal 108, 109 (1997). For instance, plaintiffs have been expected to prove discrimination with direct evidence of discrimination, disparate impact analysis, or disparate treatment analysis embodied in a modification of the burden shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See A.B. & S. Auto Serv., Inc.*, 962 F. Supp. at 1060.

Based on these standards, the Simses have argued that Shellpoint violated the ECOA under both the disparate impact and disparate treatment analyses. The Simses attempt to support the discrimination claim based upon the facts that

(1) they did not receive the assumption paperwork they requested in 2010 until Shellpoint's December 2014 Letter;

(2) they did not know about Shellpoint's reinstatement requirement until, presumably, the March 2015 Letter;

(3) they interpreted Tiffany's Note not to require reinstatement of the loan;

(4) they had to submit Tiffany's authorization to initiate the assumption process multiple times despite Mr. Agostino's March 2010 Letter to Attorney Bengs;

(5) they submitted 75 documents responsive to Shellpoint's documentation requests multiple times from approximately December 2014 until June 2015;

(6) their phone calls to Shellpoint's in the first half of 2015 were not returned or were met with refusal to discuss the assumption; and

(7) in a phone conversation in June 2015, Ms. Cox made the following brief statement to Mr. Sims: "These people, you know how they treat us."

### a.    Disparate Impact

Under the disparate impact theory, a plaintiff must demonstrate that a defendant's race-neutral policy, procedure, or practice disproportionately impacts a protected class. *See e.g.*, *id.* at 1060–61 (citing *Saldana*, 1996 WL 332451, at *2); *accord Simms v. First Gibraltar Bank, et al.*, 83 F.3d 1546, 1555 (5th Cir. 1996), cert. denied sub nom, *Simms v. First Madison Bank, FSB*, 519 U.S. 1041 (1996). Plain and simple, the Simses have not identified a race-neutral Shellpoint policy that has a greater impact on members of a protected class. The Simses ask the Court to interpret Shellpoint's assumption policy in this way. However, both Tiffany's Note and the Subservicing Agreement governing

Shellpoint's assumption practices [DE 73-1 at 58–59] give Shellpoint consideration discretion in establishing parameters for assumptions. With such discretion, it is reasonable for Shellpoint to include a reinstatement requirement into their assumption process. In fact, such a reinstatement requirement would protect assumption applicants like the Simses from being expected to pay the loan in full immediately upon assumption. After all, by assuming a mortgage loan, assumption borrowers would be agreeing to all the original terms of the loan, which reasonably allows a demand for payment in full upon default. If the delinquent loan were not cured before the assumption, they would face such a demand and would not get the benefit of paying the loan over time.

Additionally, the Simses have presented no evidence comparing Shellpoint's treatment of members of protected classes in the assumption process to its treatment of non-minority applicants. Had they presented a statistical comparison of assumption applicants showing "significantly different" treatment of protected assumption applicants as compared to the general pool of applicants, the Simses probably would have established a *prima facie* case of disparate impact that could overcome summary judgment. However, the Simses merely reported how they were treated. The Court assumes that their reference to a California state court case is an attempt to show that one other person, a Hispanic, allegedly endured the same delays from Shellpoint as they did. [DE 102 at 16]. However, the Simses do not develop the case or even report its outcome leaving the Court unable to discern if the case is in any way worthy of consideration here. Other than that, the Simses did not present evidence of how any other applicant of any class was treated by Shellpoint in the assumption process. Without such evidence, no reasonably jury could find in favor of the Simses on a disparate impact theory.

### b.    Disparate Treatment

The Simses arguments under a disparate treatment theory also fall flat.  Under the disparate treatment theory, plaintiffs must establish discriminatory intent through the conventional methods of direct or circumstantial evidence.  *See Hughes v. Inland Bank & Trust*, Case No. 15 C 5006, 2017 WL 3263475, at * 2 (N.D. Ill. Aug. 1, 2017).  Disparate treatment cases of many types have often been decided using the burden-shifting framework established in the employment discrimination case of *McDonnell Douglas Corp. v. Green* cited above.  However, the Seventh Circuit offered direction regarding the application of the *McDonnell Douglas* burden-shifting framework to claims of disparate treatment in credit discrimination cases.  *Latimore*, 151 F.3d at 714.

In *Latimore*, the court held that blindly applying the *McDonnell Douglas* burden shifting framework in credit discrimination cases "would display insensitivity to the thinking behind the standard.  The court explained that "the burden of producing evidence of each element of the plaintiff's claim is on the plaintiff."  *Id.*  Therefore, the burden of production cannot shift to the defendant without reason.  *Id.*  Similarly, the Seventh Circuit subsequently clarified that in any discrimination case, all evidence—direct or circumstantial—must be evaluated as a whole.  *Ortiz v. Werner Enters., Inc.* 834 F.3d 760, 766 (7th Cir. 2016).

Thus, the *McDonnell Douglas* burden-shifting framework only applies to disparate treatment claims under the ECOA when the plaintiffs support their claim of discriminatory intent with "some ground for suspecting that the defendant has indeed violated [their] rights."  *Latimore*, 151 F.3d at 714.  Reasonable grounds for such suspicion include competitive situations, comparable to those typically faced by plaintiffs in employment

discrimination cases, such as situations where the minority borrower receives less favorable treatment than non-minority borrowers in a similar situation.  *See id.*  Persuasive circumstantial evidence such as "suspicious timing, ambiguous statements, suspect behavior toward those in the protected group, or reasons for acting that are not worthy of belief," can also establish sufficient suspicion of discrimination to warrant burden shifting. *Hughes*, 2017 WL 3263475, at *2.

Here, the evidence presented by the Simses does not establish any ground for suspecting their rights have been violated.  First, the Simses have produced no evidence of a competitive situation where minority borrowers were treated differently by Shellpoint.  Second, the circumstantial evidence the Simses rely upon does breed suspicion of discrimination.

What the Simses call a 4-year delay in delivery of the assumption paperwork cannot be attributed to Shellpoint.  Shellpoint was not servicing Tiffany's loan before March 2014.  In addition, the Simses have not produced persuasive evidence to show that Attorney Bengs's knowledge of their request for assumption paperwork in early 2010, when he represented Resurgent and before he came to represent Shellpoint, can be imputed to Shellpoint.  Moreover, evidence of imputation is not likely to exist given the constraints of attorney-client privilege and rules of professional conduct requiring lawyers to keep all aspects of their relationships with clients confidential.  As a side note, the record before the Court is blank as to the Simses' actions related to the assumption from March 2010 until December 2014 leaving a gaping hole suggesting the possibility that the Simses' had indeed abandoned their interest in the assumption.

The Simses' allegation that Shellpoint added the reinstatement requirement after they started the assumption process is also unsupported. As already discussed, the reinstatement requirement was reasonable even if it was not explicitly included in the terms of Tiffany's Note of the Subservicing Agreement. Admittedly, the Simses' interpretation of the Note as prohibiting a reinstatement requirement arguably diverges from Shellpoint's interpretation. However, the Simses are not a party to the Note or the Agreement. Therefore, the Simses' ability to interpret the intent of the parties to those contracts is limited at best and is quite unpersuasive especially because Shellpoint is a party to both contracts and therefore has better insight into the intent of the parties.

As to the multiple submissions of Tiffany's authorization, the Simses once again erroneously ascribe knowledge held by Resurgent in 2010 through Mr. Bengs to Shellpoint despite its lack of involvement with Tiffany's loan until March 2014. Nevertheless, the Simses may have a case for poor customer service by Shellpoint as it appears that the Simses may have been required to submit the same information, including Tiffany's authorization, to it multiple times. Poor customer service alone does not support an ECOA discrimination claim especially when the Simses have not incorporated the 75 documents they submitted multiple times. Without the documents or some other written presentation matching the documents submitted to the Shellpoint's list of required documents, no court or jury can determine if the apparently poor customer service could be a cover for discriminatory behavior.

Similarly, the Simses' challenges in trying to discuss the assumption with Shellpoint by phone alone might reveal poor customer service but not suspicion of discrimination. Even Ms. Cox's brief statement of "These people, you know how they

treat us" is not enough evidence to show discriminatory conduct by Shellpoint. The Court assumes that Ms. Cox would appear at trial to testify and that any hearsay concerns arising from Mr. Sims's use of her out of court statement to prove the matter asserted would be overcome. However, there is no evidence before the Court now as to the basis for her statement. As a result, at this "put-up or shut-up" moment in this litigation, the Court cannot discern from the statement alone what conduct by her employer she finds questionable or if the statement merely reflects her own personal biases.

In the end, all the Simses have presented to support their claims of disparate treatment are unsubstantiated allegations of race discrimination. They attempt to outline suspicious timing by reporting that Attorney Bengs learned that they were African-American after their exchange of communications about the assumption in 2010. Again, events in 2010 are immaterial to the outcome of any claims against Shellpoint. Ms. Cox's statement is ambiguous, but could have been clarified had the Simses' chosen to depose her or if they had attempted to discuss it with Shellpoint through written or oral discovery. Shellpoint's conduct, as reported in the record, does not demonstrate suspect behavior toward those in any protected group. Shellpoint gave the Simses multiple opportunities to complete their assumption application. They delayed the foreclosure sale to given them time to do so. When the application deadline they reported in the March 2015 letter passed without the Simses having completed their application, Shellpoint's obligation to them was over. Nevertheless, in June 2015, they still expressed willingness to consider a completed application. As a result, Shellpoint's explanation of their conduct is completely worthy of belief given the dearth of evidence from the Simses. Accordingly, the Simses have failed to establish any genuine disputes of material fact.

### III.    CONCLUSION

In summary, the Court first declines Shellpoint's request to ignore or strike the Simses' exhibits 1, 2, 3, 6, 7, 8, and 9 in light of the Simses' Declaration and Verified Third Amended Complaint as well as their ability to authenticate the evidence in the exhibits at trial.  As to the merits of the Simses' claim, the Court finds that the ECOA likely was not triggered because the Simses likely do not qualify as "applicants" under the Act and they did not complete their assumption application such that Shellpoint had no notice or statement-of-reasons obligations under the Act.

Regardless, the Simses have failed to produce evidence of discriminatory intent, a necessary element in any ECOA discrimination claim under either a disparate impact or a disparate treatment analysis.  Instead, the Simses have relied upon unsubstantiated allegations do not establish any genuine dispute of material fact.  Therefore, Shellpoint is entitled to judgment as a matter of law.  Accordingly, the Court **GRANTS** Shellpoint's motion for summary judgment.  [DE 73] and **DIRECTS** the Clerk to enter judgment in favor of Shellpoint on the Simses' remaining claim under the ECOA.

**SO ORDERED**.

Dated this 28th day of March, 2018.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge